IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,        )
                                 )
              Plaintiff,          )
                                 )
v.                               )        No. 3:18-CR-22-TAV-HBG
                                 )
ALBERT DIANCE BLEVINS,           )
                                 )
              Defendant.          )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to

28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the

District Court as may be appropriate.  This case came before the Court on April 5, 2019, for an

evidentiary hearing on the Defendant's Motion to Suppress [Doc. 29].  Assistant United States

Attorney Matthew T. Morris appeared on behalf of the Government.  Attorney Francis L. Lloyd,

Jr., represented the Defendant, who was also present.  At the conclusion of the testimony, the Court

granted the parties' request to file post-hearing briefs.  Both the Government [Doc. 52] and the

Defendant [Doc. 53] filed supplemental briefs on May 8, 2019, and the Court took the matter under

advisement.  After reviewing the parties' briefs and arguments, the evidence and exhibits presented

at the hearing, and the relevant legal authorities, the Court recommends that the Defendant's

motion to suppress be denied.


## I.        POSITIONS OF THE PARTIES

Defendant Blevins is charged [Doc. 1] with two counts of using a minor to produce

child pornography, two counts of patronizing a minor for a commercial sex act, and one count of

possession of child pornography. These charges arise out of the warrantless search of the residence, which the Defendant shares with his mother, on October 22, 2017, and the execution of a search warrant at the residence four days later on October 26, 2017.

The Defendant contends [Docs. 29, 30, & 53] that both searches were unconstitutional and asks the Court to suppress all evidence seized during two searches of his residence in October 2017. He maintains that the searches violated the Fourth Amendment, which requires a search warrant that is sufficiently particular as to the location to be searched and the items to be seized. The Defendant contends that the warrantless search of his residence was unconstitutional because his mother lacked authority to consent to the search over the Defendant's objection and did not knowingly and intelligently provide consent.[1] He also argues that the October 26, 2017, search of the residence pursuant to a search warrant was unconstitutional. The Defendant asserts that the search warrant is overly broad and insufficiently particular, because it permitted the seizure of any electronic device capable of storing electronic data.

The Government responds [Docs. 32 & 52] that law enforcement officers validly searched the Defendant's home on October 22, 2017, based upon the consent of the Defendant's mother, who had common authority over the property. It contends that, after the Defendant was arrested and removed from the premises, the Defendant's mother gave oral and written consent, which she never withdrew. The Government also maintains that law enforcement validly searched the residence on October 26, 2017, pursuant to a state search warrant. It asserts that the authorization of the seizure of any electronic equipment that could be used to store data was sufficiently particular, because the search warrant provided probable cause to believe that child

---

[1] In his original brief [Doc. 30], the Defendant also argued that his mother withdrew consent prior to the conclusion of the search. However, this contention was not supported by the testimony at the evidentiary hearing and was not reasserted in the Defendant's post-hearing brief [Doc. 53]

pornography, stored in digital format, was located at the residence.  Finally, the Government argues, even if a constitutional violation occurred, suppression of the evidence seized in the execution of the search warrant for the residence is not the appropriate remedy.  It contends that the search warrant affidavit contains ample probable cause, even without any evidence seized during the consent search, and only the overly broad portions of the search warrant, if any, should be severed.

## II.    SUMMARY OF THE TESTIMONY

The Government presented the testimony of Detective Randy Lewallen of the Scott County Sheriff's Department and Special Agent Brandon Elkins of the Tennessee Bureau of Investigation.  The Defendant presented the testimony of his mother Wilma Blevins.

Detective Randy Lewallen testified that he had worked as a detective in the Scott County Sheriff's Department for twenty-five years [Tr. at 7].[2]  On the morning of October 22, 2017, Detective Lewallen, who was on call, received a call from TBI Agent Raymond Elkins, who asked him to assist Sergeant Paul Adkins at a residence on Ross Cemetery Road [Tr. at 7].  Agent Elkins asked Detective Lewallen to help secure a Jeep, so that law enforcement could transport it [Tr. at 7-8].  Upon arriving at the residence, Detective Lewallen encountered Sergeant Adkins and the homeowner, Ms. Wilma Blevins.  Detective Lewallen stated that other family members would arrive at the residence two to three hours later and that Agent Elkins arrived much later [Tr. at 8].  The Defendant Albert Blevins was not present at the residence when Detective Lewallen arrived, and Detective Allen believed the Defendant had been transported to jail [Tr. at 9].

---

[2] The transcript [Doc. 44] of the April 5, 2019 evidentiary hearing was filed on April 19, 2019.

Detective Lewallen stated that, after arriving, he placed sticker tags on the doors of the Jeep, so that it could not be opened without law enforcement knowing [Tr. at 9]. He said that he then talked with Ms. Blevins, telling her why he was there [Tr. at 9]. Detective Lewallen described Ms. Blevins as "a real character," who was hard to get along with and not happy with law enforcement when he arrived [Tr. at 9-10]. Detective Lewallen talked with Ms. Blevins on her porch [Tr. at 10]. Ms. Blevins was upset with a couple of officers, because her son had gone to jail, and Detective Lewallen said he tried to overcome Ms. Blevins's demeanor [Tr. at 10]. Detective Lewallen stated that, ultimately, he and Ms. Blevins "g[o]t along . . . okay" and had a "good time" together [Tr. at 10]. He agreed Ms. Blevins seemed mentally alert, and he described her as "sharp" [Tr. at 10].

Detective Lewallen stated that after talking with Ms. Blevins for a time, he asked if she would give consent for law enforcement to search her residence [Tr. at 10]. He said that Ms. Blevins gave consent for the search and signed a waiver [Tr. at 10]. Detective Lewallen identified the consent form [Exh. 1] that Ms. Blevins signed and testified that both he and Sergeant Adkins signed the consent form as witnesses [Tr. at 10-11]. He agreed that he signed the consent form at 12:50 p.m. [Tr. at 12]. Stephen Blevins, the Defendant's brother, also signed the consent form as a witness [Tr. at 11].

Detective Lewallen said that he discussed the consent form with Ms. Blevins [Tr. at 12]. He stated that although he did not remember their conversation about the form, his normal practice is to go over the consent form and to make it clear that the person does not have to consent [Tr. at 12-13]. He agreed the consent form states that the individual has a constitutional right to a search warrant and the right to refuse consent [Tr. at 13]. Detective Lewallen said the residence was not searched immediately after Ms. Blevins signed the consent form [Tr. at 14]. Instead, law

4

enforcement waited until Agent Elkins arrived, before they searched the residence [Tr. at 14]. He said that once Agent Elkins arrived, Agent Elkins talked with Ms. Blevins, who signed a second consent form [Tr. at 14; Exh. 3]. Detective Lewallen said that he also signed the second consent form as a witness [Tr. at 14].

According to Detective Lewallen, following the execution of the second consent form, the officers searched the residence [Tr. at 15]. Detective Lewallen stayed with Ms. Blevins during the search, even accompanying her to the bathroom, where he waited for her outside the closed door [Tr. at 15]. Detective Lewallen said that during the search, he and Ms. Blevins talked about "everything or lots of things" [Tr. at 15]. He said her family members remained at the residence during the search as well [Tr. at 16]. Detective Lewallen said that he never heard Ms. Blevins withdraw her consent to search the house [Tr. at 16]. He also did not hear other family members ask the officers to stop searching the residence [Tr. at 16]. Detective Lewallen said that he remained at the residence until a tow truck came for the Jeep, which was after the residence had been searched [Tr. at 16-17].

On cross-examination, Detective Lewallen testified that the Defendant was arrested before Agent Elkins called Detective Lewallen and asked him to go to the residence [Tr. at 22-23]. He had heard that Sergeant Adkins and Deputies Shane Blevins and Gordon Burt, all of the Scott County Sheriff's Department, were present for the arrest [Tr. at 22]. Detective Lewallen did not know if Ms. Blevins told these officers that she did not want them to search her home, but he knew that she was not happy with the situation [Tr. at 22]. Detective Lewallen said he had heard that Ms. Blevins told at least one of the arresting officers that they were not welcome there and that she wanted them to leave, which they did [Tr. at 23]. Detective Lewallen said he learned about

this comment recently and did not know about it at the time he went to the residence on October 22, 2017 [Tr. at 26].

Detective Lewallen said that when Agent Elkins called him, Agent Elkins said that he was involved with an important case that had occurred overnight [Tr. at 23]. Agent Elkins asked Detective Lewallen to go to the Blevins residence and assist Sergeant Adkins with securing a vehicle using date-tags, because this was a serious case [Tr. at 24]. Detective Lewallen said during that initial call, Agent Elkins did not ask him to get Ms. Blevins to consent to a search, but Agent Elkins requested that later in the day [Tr. at 24]. Detective Lewallen agreed that Agent Elkins asked him if he could get Ms. Blevins to consent to a search to prevent Agent Elkins from having to get a search warrant [Tr. at 24-25].

Detective Lewallen was at the Blevins residence two to three hours before Ms. Blevins signed the consent form [Tr. at 18]. He said that he arrived around 10:00 a.m. and witnessed Ms. Blevins sign the first consent form at 12:50 p.m. [Tr. at 18]. Stephen Blevins was also present and witnessed the first consent form [Tr. at 21]. Detective Lewallen agreed that he spent about two hours talking with Ms. Blevins outside the residence before she signed the consent form [Tr. at 19]. He said that he also secured the Jeep during that time [Tr. at 19]. Sergeant Adkins was with Ms. Blevins and him [Tr. at 19-20]. Detective Lewallen stated that about two hours elapsed between Ms. Blevins signing the first consent form and her signing the second consent form at 3:12 p.m. [Tr. at 20]. He said that during that two-hour period, the officers did not search the residence [Tr. at 20]. Detective Lewallen related that a second consent form from the TBI was signed because it was Agent Elkins's investigation [Tr. at 21]. The search commenced after Ms. Blevins signed the second consent form [Tr. at 21]. Stephen Blevins also witnessed the second consent form, although he did not live at the residence [Tr. at 22].

6

Detective Lewallen did not recall previously being at the residence before that day, nor did he recall previously meeting Ms. Blevins [Tr. at 25]. He said that Ms. Blevins was "hard to get along with" and that he "had to warm up to her" [Tr. at 26]. However, Detective Lewallen said he ultimately got along with Ms. Blevins, and they had a good time while waiting together [Tr. at 26].

On redirect examination, Detective Lewallen testified that Agent Elkins did not tell him to get consent from Ms. Blevins but, instead, asked him to ask if she would consent [Tr. at 26]. He said Ms. Blevins gave consent and did not revoke her consent in his presence [Tr. at 26-27].

Special Agent Brandon Elkins testified that he has been a TBI agent since September 2013, and before that, he worked for the Campbell County Sheriff's Office [Tr. at 28]. On October 21, Detective Pam Jarrett of the Jacksboro Police Department contacted Agent Elkins, told him that she was investigating the abduction and sexual battery of a juvenile male, and asked for his help [Tr. at 28-29]. Agent Elkins met Detective Jarrett at the Jacksboro Police Department to be briefed on the case. Agent Elkins then called Detective Randy Lewallen, whom Agent Elkins believed was involved in the arrest of the Defendant. Agent Elkins called Detective Lewallen from the Jacksboro Police Department and asked him to go to the scene of the Defendant's arrest to seal and hold a Jeep Grand Cherokee located there [Tr. at 29-30]. Agent Elkins said they also discussed the juvenile's complaint, the investigation to that point, what evidence should be sought, and whether they could get consent to search the Defendant's residence [Tr. at 30]. After talking with Detective Lewallen, Agent Elkins spoke with Detective Jarrett again, contacted his supervisor, and then left for Scott County [Tr. at 30].

Agent Elkins stated that when he arrived at the Defendant's residence, he spoke with Detective Lewallen, who showed him a consent form that Ms. Blevins had signed [Tr. at 31]. Detective Lewallen also introduced Agent Elkins to Ms. Blevins and her son Stephen Blevins [Tr. at 31]. Agent Elkins said other family members were also there [Tr. at 31]. Agent Elkins stated that he sat on the porch swing with Ms. Blevins, showed her his credentials, and explained why he was there [Tr. at 32]. He said he told her they would like to search the residence and read a TBI consent-to-search form to Ms. Blevins and her son [Tr. at 31-32]. Agent Blevins said Ms. Blevins signed the consent form and that he, Detective Lewallen, and Steve Blevins signed as witnesses [Tr. at 33]. Agent Elkins opined that Steve Blevins was there to support his mother [Tr. at 33]. Agent Elkins stated that Ms. Blevins listened when he read and explained the form and that she seemed to understand what he was asking [Tr. at 34]. He said that after Ms. Blevins signed the consent form, she never told him that she did not want him to search her residence [Tr. at 34, 46]. He said Ms. Blevins's family members never withdrew permission to search [Tr. at 46].

Agent Elkins identified a hand-drawn diagram of the residence [Exh. 4] and his handwritten inventory [Exh. 5] of the items seized. He stated that his notes reflect the officers entered the house to begin the search at 15:25 and left at 18:18, after completing the search [Tr. at 35-36]. He said the search took nearly three hours because the officers had to photograph and document a large number of firearms seized from a back bedroom, which did not appear to be in use [Tr. at 36, 40]. He said that officers also seized a box of photographs from the Defendant's bedroom [Tr. at 43-44]. Agent Elkins testified that he knew this bedroom was the Defendant's bedroom based upon items in the room and because Ms. Blevins told him it was the Defendant's bedroom [Tr. at 43]. Agent Elkins said that he talked with Ms. Blevins a few times during the

search of the residence, to ask her questions about items, such as two firearms found in her bedroom, which were not seized [Tr. at 42, 46].

Agent Elkins also identified a photograph [Exh. 6] of the Defendant's Jeep Grand Cherokee, which was seized and impounded that day [Tr. at 36]. He said he did not ask Ms. Blevins for consent to search the Jeep, because it was not her Jeep [Tr. at 37]. Agent Elkins testified that the Jeep was transported to Scott County's garage, where it was later searched pursuant to a search warrant obtained on October 23 [Tr. at 36, 47]. In the Jeep, law enforcement found a cord and power adaptor for a laptop computer [Tr. at 49].

Agent Elkins said that after the search of the Jeep, he interviewed two minor males, who provided information that he used to obtain a second search warrant for the Defendant's residence [Tr. at 51]. During his continued investigation of the case, Agent Elkins learned that the Defendant had sex with minors for money and that he had taken photographs and videos during these encounters [Tr. at 52]. Agent Elkins stated that he also interviewed an adult male, who reported going with the Defendant to hotels on several occasions and having sex with juvenile males, who were paid [Tr. at 52-53]. Agent Elkins said the adult male, whom he interviewed, also discussed photographs being taken and a laptop computer [Tr. at 53]. Agent Elkins testified that he listened to recordings of telephone calls made by the Defendant while he was detained in the Campbell County Jail [Tr. at 53]. Agent Elkins stated that during a telephone conversation with his mother, the Defendant discussed the search of the residence and asked multiple times whether law enforcement had taken his laptop [Tr. at 53]. Agent Elkins said this information was included in a search warrant for the Defendant's residence [Tr. at 53-54].

Agent Elkins testified that his investigation had changed by the time he returned to the Defendant's residence to execute the search warrant [Tr. at 54]. He said during the second

search of the Defendant's residence, law enforcement seized a laptop computer and other items capable of storing digital files [Tr. at 55].

On cross-examination, Agent Elkins testified that no pornography was found in the box of photographs seized from the Defendant's bedroom in the initial search of the residence [Tr. at 56]. Agent Elkins said he called Detective Lewallen around 10:30 a.m. from the Jacksboro Police Department [Tr. at 57]. Agent Elkins stated that the Defendant had already been arrested by the time he arrived at the residence on the day of the consent search [Tr. at 58]. He said that Ms. Blevins did not express anger toward the arresting officers while he was there, nor did he hear reports of her doing so [Tr. at 58]. He said that he was never given information during his investigation that Ms. Blevins had told officers to leave her property on the day of the consent search [Tr. at 58]. Agent Elkins testified that the consent search occurred on October 22, which was also the day the Defendant was arrested, and a search warrant was executed at the residence on October 26, 2017 [Tr. at 59]. He said the drawing of the layout of the house [Exh. 4] was made at the time of the execution of the search warrant [Tr. at 59]. He agreed that by the time of the execution of the search warrant, he knew that the Defendant had his own bedroom in the residence and that only the Defendant and Ms. Elkins lived at the residence [Tr. at 59-60].

Ms. Wilma Blevins, the Defendant's mother, testified that on the day of the Defendant's arrest, twenty-one (21) law enforcement officers came to her house, late in the evening [Tr. at 67-68]. She said she spoke with the officers, telling them they were not searching her house without a warrant [Tr. at 68-69]. Ms. Blevins said another officer came to her residence and said someone else was bringing a warrant now [Tr. at 68]. Ms. Blevins stated that she did not hold the warrant or read it but, instead, took the officer's "word for it" that they had a warrant [Tr. at 68]. She recalled that Detective Lewallen, whom she had seen a few times before, and Officer Atkins

10

were among the officers who came to her property [Tr. at 69]. She said she told both Detective Lewallen and Officer Adkins that they could not search without a warrant [Tr. at 69].

On cross-examination, Ms. Blevins acknowledged that the Defendant had previous arrests and spent time in jail before this incident [Tr. at 70]. She agreed that he could potentially go to jail for a long time in relation to this case [Tr. at 70]. She acknowledged that she speaks with the Defendant on the telephone frequently and that they have discussed her testifying in this case multiple times [Tr. at 71]. Ms. Blevins agreed that she knew it was important to the Defendant for her to testify on his behalf at this hearing [Tr. at 71]. She agreed that her signature is on the consent form [Exh. 1], but she did not remember signing it [Tr. at 71-72]. Ms. Blevins reiterated that she told the officers that "they had to get a paper before they search [sic.]" [Tr. at 72]. She did not remember Detective Lewallen discussing the consent form with her before she signed it [Tr. at 72].

Ms. Blevins recognized her signature, as well as that of her son Stephen Blevins, on the second consent form [Tr. at 72-73; Exh. 3]. Ms. Blevins testified that before the Defendant's arrest in October 2017, she had received a pacemaker [Tr. at 73-74]. She also said that after the search of her residence, she had had some health problems, including a stroke [Tr. at 73]. Ms. Blevins stated that medical personnel at the Pat Summitt Clinic had diagnosed her with "a little dementia," but that her condition did not rise to the point of having Alzheimers [Tr. at 74]. Ms. Blevins agreed that law enforcement searched her house twice and that the officers seized a laptop during the second search [Tr. at 74]. When asked if she was possibly remembering the search warrant for the second search when she stated on direct examination that the officers had a warrant when they came to her house, Ms. Blevins said, "[a]s far as I remember, they didn't have a warrant for the second one, but they did have a warrant for the first one" [Tr. at 74].

11

On redirect examination, Ms. Blevins stated that in October 2017, the Defendant was living with her and he had his own bedroom in the house [Tr. at 75]. She agreed that only she and the Defendant lived at her house at that time [Tr. at 75].

In addition to the testimony of the witnesses, the Court considered a letter [Exh. 31] dated March 21, 2019, from Dr. Bruce LeForce, a neurologist at the Pat Summit Clinic, who states that Ms. Blevins has been diagnosed with dementia and is not able to testify in court [Tr. at 64].

### III.   FINDINGS OF FACT

The Court makes the following factual findings in this case:

In October 2017, Defendant Blevins lived with his mother in her house in Scott County. On the early morning of October 22, 2017, Sergeant Paul Adkins and other officers from the Scott County Sheriff's Department arrested Defendant Blevins at his home on charges of especially aggravated kidnapping and sexual battery. At the time of his arrest, the Defendant's mother, Wilma Blevins, told the arresting officers they were not welcome on her property and asked them to leave. The officers left and transported the Defendant to jail.

Later that morning, Jacksboro Police Department Detective Pamela Jarrett, the officer who obtained the arrest warrants for the Defendant, called TBI Agent Brandon Elkins, seeking his help with the Defendant's case. After being briefed on the case, Agent Elkins called Scott County Sheriff's Department Detective Randy Lewallen and asked him to go to the Blevins's residence to secure the Defendant's Jeep Grand Cherokee for transport. He also asked Detective Lewallen to determine whether Ms. Blevins would give consent to search the residence.

Detective Lewallen arrived at the Blevins residence around 10:00 a.m. and sealed the Jeep with dated sticker tags. He then talked with Ms. Blevins, while he and Sergeant Adkins awaited a tow vehicle for the Jeep. During the morning, Ms. Blevins's adult son Stephen Blevins and a female family member arrived. After about two hours, Detective Lewallen asked Ms. Blevins to sign a consent-to-search form, and she agreed. Detective Lewallen read the form to Ms. Blevins, explained that she was signing a consent form, and informed her that she did not have to give consent to search her home. Ms. Blevins signed the consent form [Exh. 1] at 12:44 p.m., and Detective Lewallen, Sergeant Adkins, and Stephen Blevins signed the consent form at 12:50 p.m., as witnesses. Although Ms. Blevins granted consent just before 1:00 p.m., the officers did not begin searching the house at that time but waited for Agent Elkins to arrive.

Agent Elkins arrived at the Blevins residence around 3:00 p.m. and spoke with Detective Lewallen, who showed him the consent form signed by Ms. Blevins. Agent Elkins introduced himself to Ms. Blevins, showed her his credentials, and explained why he was there. He asked Ms. Blevins to sign a second consent-to-search form, which he read to her. Ms. Blevins agreed, and Agent Elkins reviewed the form with her. Ms. Elkins signed the second consent form [Doc. 3] at 3:12 p.m., and Agent Elkins and Detective Lewallen signed as witnesses. Stephen Blevins also signed this consent form. Officers then searched the entire Blevins house, including the bedroom that Ms. Blevins identified to Agent Elkins as the Defendant's bedroom. During the search, Ms. Blevins waited on the front porch with Detective Lewallen. Agent Elkins asked Ms. Blevins several questions about items in the house. At no time after Detective Lewallen's arrival at the residence did Ms. Blevins ask the officers to stop the search. Law enforcement seized a box of photographs from the Defendant's bedroom, numerous firearms and ammunition from an unoccupied bedroom, and two keys to the Jeep and an Apple cellular telephone from a small table

13

in the living room.  After the search was concluded, law enforcement had the Jeep towed to the Scott County garage.

On October 23, 2017, law enforcement obtained a search warrant to search the Defendant's Jeep.  Officers seized a cord and power adaptor for a laptop computer from the Jeep, along with underwear, multiple tubes of personal lubricant, and sexual aids.

After the search of the Jeep, Agent Elkins interviewed two juvenile males, who stated that the Defendant had paid them for sex and had taken photographs and video footage during these encounters.  Agent Elkins also interviewed an adult male, who admitted going to hotel rooms with the Defendant, where they had sex with underage males.  This individual said a laptop was a part of these encounters.  Finally, Agent Elkins listened to a recording of a telephone conversation between the Defendant and his mother, while the Defendant was in jail.  During this conversation, which occurred soon after his arrest, the Defendant discussed the initial search of the residence and repeatedly asked his mother whether officers had taken his laptop.  Based upon the evidence seized during the October 22 search of the Defendant's home and during the search of the Jeep, the interviews, and the jail telephone call, Agent Elkins prepared an affidavit and obtained a search warrant for the Defendant's residence.  Law enforcement executed the search warrant at the Defendant's residence on October 26, 2017, and seized a laptop computer, a tablet computer, four cameras, four SD cards, thirteen floppy diskettes, and hotel key cards.  Sixteen months[3] after the second search of the residence, Ms. Blevins was diagnosed with dementia.

---

[3]Ms. Blevins's medical records were included as exhibits to a Motion to Quash or Modify Subpoena [Doc. 35], filed by her guardian ad litem.

## IV.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV.  To comport with the Constitution, searches must be pursuant to a warrant, which "shall issue[ only] upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  *Id.*  In the instant case, Defendant Blevins argues law enforcement officers violated his rights under the Fourth Amendment, when they searched the residence, where he lived with his mother, on October 22 and October 26, 2017.  The Defendant argues that the warrantless search on October 22, 2017, was unconstitutional, because his mother did not knowingly and voluntarily consent and also lacked authority to give consent.  He also contends that the October 26, 2017, search of the residence violated his rights under the Fourth Amendment, because the search warrant, which permitted the seizure of any electronic device capable of storing electronic data, was overly broad and insufficiently particular.  The Court examines each of these arguments in turn.

### A.  October 22, 2017 Warrantless Search

Defendant Blevins asks the Court to suppress all evidence seized during the October 22, 2017 warrantless search of his residence.  Although law enforcement obtained the consent of his mother, the homeowner, to search the residence, the Defendant contends that Ms. Blevins' consent was not knowingly or voluntarily given.  In this regard, he argues that earlier that day, Ms. Blevins told officers that they could not search without a warrant.  He asserts that her subsequent signature on two consent forms was the product of police coercion or deception. Additionally, he argues that even if his mother gave consent for the search, she lacked the authority to do so, because the officers could have consulted him or obtained a search warrant.

15

An individual's voluntary consent to an officer's entry into or search of his or her home is an exception to the warrant requirement of the Fourth Amendment. A valid search of a premises may be made without a warrant and without probable cause, if the person voluntarily consents to the search. *Schneckloth v. Bustamante*, 412 U.S. 218, 219, 228-29 (1973); *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011); *United States v. Van Shutters*, 163 F.3d 331, 335 (6th Cir. 1998) (holding that "[i]t is well-established that a warrantless search by law enforcement officials will be upheld if a detainee has voluntarily consented to the search"). Whether this exception applies is evaluated by examining the totality of the circumstances, with the burden resting on the government to prove both actual consent and its voluntary nature. *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978). The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. *United States v. Hinojosa,* 606 F.3d 875, 881 (6th Cir. 2010); *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999).

In the instant case, the Court finds that the Government has proven that Ms. Blevins gave actual consent to search her home on October 22, 2017. In this regard, both Detective Lewallen and Agent Elkins testified that she signed two consent forms on that day. Detective Lewallen and Agent Elkins testified that they read and explained the forms to Ms. Blevins and that she agreed to the search and signed the forms. The two consent forms [Exhs. 1 & 3] were produced at the evidentiary hearing, and they bear Ms. Blevins's signature. Ms. Blevins said that she did not remember signing the consent forms, but she agreed that her signature appeared on both forms. Accordingly, the Court finds that the Government has proven that Ms. Blevins gave consent to search her residence. The questions in this case are (1) whether that consent was voluntarily given and (2) whether Ms. Blevins had the authority to give consent.

*(1) Voluntariness*

"Consent to a search must be voluntary and free of duress or coercion, express or implied." *United States v. Thomas*, 662 F. App'x 391, 395 (6th Cir. 2016); *cert. denied* 137 S. Ct. 1599 (2017); *Worley*, 193 F.3d at 386 (requiring that consent to search be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion"). In determining whether consent was voluntary, the Court considers the totality of the circumstances, including the "characteristics" of the consenting individual, such as (1) the individual's age, intelligence, and education level; (2) whether the individual understood she had the right to decline to consent; and (3) whether the individual understood her constitutional rights. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). The Court also considers the "details of the detention," such as (4) the nature and duration of the detention; (5) whether law enforcement used coercive or punitive conduct; and (6) any "indications of 'more subtle forms of coercion that might flaw [an individual's] judgement.'" *Id.* (quoting *United States v.* Watson, 423 U.S. 411, 424 (1976)); *see also Worley*, 193 F.3d at 386.

In the instant case, the Defendant argues that Ms. Blevins's consent was not voluntary, because law enforcement used both coercion and deception. He maintains that at the time of the Defendant's arrest, Ms. Blevins told the officers that they would not be permitted to search her property, unless they came back with a warrant. However, later that morning, she signed the consent forms, after law enforcement officers talked with her several hours. The Defendant also contends the officers tricked his mother into giving consent by telling her that one of the officers already had or was getting a search warrant.

As an initial matter, the Court finds that although Ms. Blevins was upset with the arresting officers and may have asked them to leave, she did not tell the arresting officers that they could

17

not search her house, unless they had a search warrant. There is no evidence that the arresting officers asked to search the house. Neither Detective Lewallen, nor Agent Elkins, were present, at the time of the Defendant's arrest. Detective Lewallen testified that while he did not know whether Ms. Blevins told the arresting officers that she did not want them to search her home, he later learned that Ms. Blevins told at least one of the arresting officers that they were not welcome on her property and that she wanted them to leave. Agent Elkins testified that he had not heard that Ms. Blevins was angry with the arresting officers or that she asked them to leave. Neither officer heard Ms. Blevins request a search warrant in their presence.

The Court observes the only positive testimony that Ms. Blevins instructed law enforcement they could not search her home without a search warrant comes from Ms. Blevins, who testified that she told the officers who came to her house on the day of the Defendant's arrest that they were not searching her house without a warrant. However, the Court does not credit this testimony, because Ms. Blevins was clearly confused about the timing of the events, which had occurred over eighteen months earlier.[4] She testified that the officers came to her home to arrest her son late in the evening; however, Detective Lewellen testified that the Defendant was arrested in the morning, before he arrived on the scene. She also testified that the officers did not have a search warrant when they searched her home a second time and seized a laptop computer. This testimony is contrary to the testimony and exhibits presented at the evidentiary hearing and even to the Defendant's position on this issue. Moreover, both consent forms, which were read and

---

[4] The undersigned previously found [Doc. 39] that despite a diagnosis of mixed Alzheimers and vascular dementia, Ms. Blevins is not an incompetent witness, nor barred from testifying, due to mental incapacity. Fed. R. Evid. 601, Advisory Comm. Notes; *United States v. Phibbs*, 999 F.2d 1053, 1068 (6th Cir. 1993) (observing that "the Federal Rules of Evidence strongly disfavor barring witnesses on competency grounds due to mental incapacity"), *cert. denied,* 510 U.S. 1119 (1994). Instead, the Court found that it must consider her mental health issues with regard to the weight and credibility the Court gives her testimony. Fed. R. Evid. 601, Advisory Comm. Notes.

18

explained to Ms. Blevins, state that she has a right not to have her home searched without a search warrant.  Ms. Blevins did not raise or renew a demand for a search warrant when the consent forms were read and explained.  Accordingly, the Court finds that Ms. Blevins did not tell the arresting officers or Detective Lewallen and Agent Elkins that they could not search her home without a search warrant.

Looking to the totality of the circumstances, the Court finds that Ms. Blevins voluntarily consented to the search of her home on October 22, 2017.  First, the Court looks to Ms. Blevins's personal characteristics, such as her age, intelligence, and education level.  *See* Ivy, 165 F.3d at 402.  Based upon medical records provided to the undersigned in relation to a Motion to Quash Ms. Blevins's testimony at the evidentiary hearing, the Court learned that Ms. Blevins was eighty years old at the time of the Defendant's arrest and that she had attended school through the tenth grade [Doc. 35-4, p.1].  Ms. Blevins worked as a sewing machine operator for forty years, before retiring [Doc. 35-4, p.2].  She lived in her own home in October 2017, although she had a caregiver who stayed with her part of the time and she had some health problems.[5]  Detective Lewallen agreed Ms. Blevins was "mentally alert" and described her as being "sharp," on the day in question [Tr. at 10].  Although Ms. Blevins was diagnosed with dementia in February 2019 [Doc. 35-5], the evidence and medical records before the Court do not reveal whether or to what degree she was experiencing mental impairment or confusion in October 2017.  However, the Court finds that Detective Lewallen and Agent Elkins did not perceive her to be impaired or confused when they spoke with her on October 22, 2019.  Thus, the Court finds that Ms. Blevins's personal characteristics indicate that her consent was knowing and voluntary.

---

[5] Although Ms. Blevins testified that she suffered a stroke after October 2017, her medical records indicate that she had made a "good recovery" from a stroke approximately thirteen years before the Defendant's arrest [Doc. 35-4, p.1].  However, she and her family reported to her medical caregivers that she began having dizziness and falls in 2017 [Doc. 35-4, p.1].

19

The Court also finds that Ms. Blevins was told that she had the right to decline to give consent to search. The second consent form [Exh. 3] states that the signor has been "informed . . . of my right to refuse to consent to such a search[.]" Agent Elkins testified that he read the consent form to Ms. Elkins and explained it to her. The Court finds that Ms. Elkins knew she had the right to refuse consent. The Court also finds that Ms. Blevins knew she had the right to require the agents to get a search warrant to search the residence. Both consent forms [Exh. 1 & 3] state that the signor has been advised of the constitutional right not to have a search of the premises without a search warrant. Again, the Court notes that these consent forms were read to Ms. Blevins. Thus, the Court finds that the characteristics of Ms. Blevins support a finding that her consent was voluntarily given. Although Ms. Blevins was elderly and had some health problems at the time she gave consent, she was alert and living in her own home, she had the support of close family members at the time she gave consent, she was advised of her constitutional right to require a search warrant and her ability to refuse consent, and she appeared alert and mentally sharp to the officers.

The Defendant argues that Ms. Blevins was deceived by the officers, who led her to believe that either they had a search warrant or they were getting one, at the time she signed the consent forms. This argument is supported by Ms. Blevins's testimony that one of the officers told her that they were bringing a warrant and that she thought a piece of paper shown to her was a warrant, although she did not hold it or read it.[6] However, the circumstances surrounding the signing of

---

[6] The Government also notes in its post-hearing brief [Doc. 52, p.7] that during a recorded jail telephone conversation on October 22, 2017 [Exh. 30], Ms. Blevins told the Defendant that "they [the officers] had a warrant." The Court notes that immediately before this statement, Ms. Blevins also said that she made the officers get a search warrant, because she would not allow them to search her house without one. The Government suggests that Ms. Blevins told the Defendant that the officers had a search warrant on October 22, because she thought the Defendant would be upset with her for consenting to the search or because she was confused by the inventory provided at the end of the warrantless search. In any event, the Court does not consider this comment in assessing

20

the consent forms do not support this testimony. Ms. Blevins's son Stephen Blevins and another family member were present at the time Ms. Blevins signed both consent forms, and Mr. Stephen Blevins also signed as a witness to both. The Court finds that Ms. Blevins had family members present supporting her and looking out for her interests. Thus, it would have been difficult for law enforcement to trick Ms. Blevins into believing they had a search warrant, while simultaneously having her sign a form that waived her right to a search warrant, all of which occurred while her family members witnessed the consent.

The Court also observes that telling an individual that the officer *will get* a search warrant, if the individual does not consent, does not taint the consent to search. *Ivy*, 165 F.3d at 403; *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir.) (holding it to be "well-settled that the agent's statements to the effect that he would obtain a warrant if [the defendant] did not consent to the search does not taint [the defendant's] consent"); *cert. denied* 523 U.S. 122 (1998). In the instant case, however, there is no evidence that a law enforcement officer told Ms. Blevins that he would get a search warrant, if she did not give consent. The Court finds that the officers explained to Ms. Blevins that she had the right to require a search warrant and the officers did not misrepresent to her that they had a search warrant at the time she signed the consent forms. If Ms. Blevins thought the officers had a search warrant, she did not communicate that misunderstanding to anyone at the time she signed the consent forms.

---

the voluntariness of Ms. Blevins's consent to search on October 22, because it occurred after the fact and was not part of the totality of the circumstances surrounding the consent. Instead, the Court considers this comment only with regard to the credibility of Ms. Blevins's testimony that she told the officers that they had to get a search warrant and that the officers told her that they had or were bringing a search warrant on October 22, 2017. Given the contrary testimony by the officers, and the fact that Ms. Blevins's son Stephen Blevins witnessed her sign two consent forms for the warrantless search, the Court gives little weight to Ms. Blevins's comment about a search warrant on the recorded jail call.

The Court turns next to the circumstances of the consent. With regard to the nature and duration of the detention, the Court finds that Ms. Blevins was on the porch of her home with her son at the time she gave consent. It is not clear that Ms. Blevins was "detained" or *required* to wait outside her home with law enforcement prior to providing consent. Detective Lewallen stated that he was sent to the residence to assist Sergeant Adkins with securing the Jeep for transport. Once the Jeep was secured, Detective Lewallen, who was waiting on the tow vehicle, sat on the porch with Ms. Blevins and talked with her for a couple of hours before she agreed to give consent. The Court finds that the nature and duration of the time with law enforcement preceding her consent was not coercive. The Court also finds that law enforcement did not exhibit coercive or punitive conduct. There is no evidence that Detective Lewallen or Sergeant Adkins raised their voices, drew their weapons, or restricted Ms. Blevins's movements in any way. Instead, the testimony at the evidentiary hearing revealed that the officers sat with Ms. Blevins on her porch and talked. As discussed above, the Court rejects the Defendant's contention that the officers told Ms. Blevins that they already had a search warrant.

Finally, the Court examines whether there were any subtle forms of coercion at work in this case. Detective Lewallen admitted that when he arrived, Ms. Blevins was upset with the officers who had arrested her son. He testified that when he arrived, Ms. Blevins "wasn't real happy with law enforcement. She was hard to get along with. I mean, I had to try to warm up to her and get along with her" [Tr. at 10]. He continued, "There was one or two of the law enforcement officers that she was really upset with and I tried to overcome that" [Tr. at 10]. Detective Lewallen's efforts to get law enforcement back in Ms. Blevins's good graces are perhaps a subtle attempt to sway her response on the question Detective Lewallen intended to ask her, i.e., whether she would consent to a search of her home. However, the Court does not find that it was

coercive. The Court finds that Detective Lewallen did not lie to Ms. Blevins or misrepresent the nature of the investigation. *See United States v. Boyd*, 910 F. Supp. 2d 995, 1002 (W.D. Mich. 2011) (holding that trickery or misrepresentation about the nature of the investigation are relevant to the voluntariness of consent). Accordingly, considering the totality of the circumstances, including the characteristics of Ms. Blevins and the circumstances of the consent, the Court finds that Ms. Blevins's consent to search was voluntary and not tainted by coercion or duress.

### (2) Authority to Consent

The Defendant also contends that even if the Court finds that Ms. Blevins voluntarily consented to the search of the residence, she lacked authority to give consent in the face of his privacy interest in the property. The Government responds that Ms. Blevins had common authority over the residence and, thus, the authority to give consent to search. Moreover, the Government maintains that the officers were not obligated to seek the Defendant's consent in his absence. The Court agrees.

A warrantless search does not violate the Fourth Amendment when a person who possesses common authority over the premises consents to the search. *United States v. Matlock,* 415 U.S. 164, 170–71 (2007). "Common authority" derives from the "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 171 n.7. In the present case, the residence belonged to Ms. Blevins and she and the Defendant both lived there. Thus, the Court finds that Ms. Blevins had common authority to consent to a search of the residence. Moreover, the officers were not required to go to the jail, where the Defendant was detained, to ask the Defendant for his consent. *Fernandez v. California*, 571 U.S. 292, 303 (2014) (holding that an

23

Case 3:18-cr-00022-TAV-HBG   Document 56   Filed 07/30/19   Page 23 of 31   PageID #: 499

occupant detained offsite is treated the same as any absent co-occupant for purposes of consent to search); *United States v. Penney*, 576 F.3d 297, 309 (6th Cir. 2009).

The Defendant elicited testimony at the evidentiary hearing that Agent Elkins knew which bedroom in the Blevins residence was the Defendant's bedroom, because of the items located in the bedroom and because Ms. Blevins pointed out to him which bedroom was the Defendant's. Although the Defendant notes this testimony in his post-hearing brief, he does not argue that Ms. Blevins lacked common authority over the Defendant's bedroom, only that she lacked authority to consent to a search of the house without the Defendant's joint consent. Our appellate court has previously held that a stepparent has common authority to consent to the search of the bedroom of the twenty-five-year-old defendant, who was living in his parents' house. *United States v. Austin*, Nos. 94-4220, 94-4238, 94-4278, 1996 WL 109500, *4 (6th Cir. Mar. 11, 1996) (unpublished). In *Austin*, the court determined that although adult children likely have a greater expectation of privacy than minor children, the circumstances of that case (the defendant's parents regularly searched his bedroom in their house for drugs) indicate defendant "was living in the room subject to his parents' terms." *Id.*

The Government argues that even if Ms. Blevins lacked actual authority to consent, she had the apparent authority to consent. The consent of a party possessing apparent authority is valid "if the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *United States v. Turner*, 287 F. App'x 426, 430 n.3 (6th Cir. 2008) (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990)) (internal quotation marks omitted). Agent Elkins rightly believed that Ms. Blevins had common authority over all of the common areas in the house, but the Court questions whether he could assume she had common authority over the Defendant's bedroom by virtue of her status as

homeowner and parent.  "[A]pparent authority cannot exist if there is ambiguity as to the asserted authority and the searching officers do not take steps to resolve the ambiguity."  *United States v. Purcell*, 526 F.3d 953, 963 (6th Cir. 2008).

> The government cannot establish that its agents reasonably relied upon a third party's apparent authority if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.  If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry.

*United States v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005) (internal quotation marks omitted).  In the instant case, the record is devoid of evidence that Detective Lewallen or Agent Elkins asked Ms. Blevins about her relationship to the Defendant's bedroom, such as whether she regularly entered, whether the Defendant locked the room, etc.

Moreover, Ms. Blevins's status as the Defendant's mother does not automatically indicate to the officers that she has mutual use and control over the Defendant's bedroom.  "Being in an intimate relationship . . . does not endow a would-be-consenter with any additional sheen of apparent authority that would survive the discovery of evidence that contradicts the consenter's asserted authority."  *Purcell*, 526 F.3d at 964; *c.f. United States v. Anderson*, 42 F. Supp. 2d 713, 723 (E.D. Mich. 1999) (observing that "the parent-child relationship creates a presumption of common authority").  Based upon the open access to the upstairs rooms occupied by the defendant, the Eastern District of Michigan held that the officer reasonably believed that the defendant's mother possessed common authority over the defendant's rooms.  *Anderson*, 42 F. Supp. 2d at 723.  However, as intergenerational living arrangements become more common, some courts have rejected a parent's apparent authority to consent to search the living area of an adult child residing in the parent's home, without the police asking about the parent's relationship to the area.  *See*

Hillary B. Farber, *A Parent's "Apparent" Authority:  Why Intergenerational Coresidence Requires a Reassessment of Parental Consent to Search Adult Children's Bedrooms*, 21 Cornell J.L & Pub. Pol'y 39, 54-59 (2011).

In the instant case, Agent Elkins testified that during the search of the residence, Ms. Elkins told him which bedroom was the Defendant's bedroom.  Once this ambiguity about Ms. Blevins's authority over that bedroom arose, it does not appear that Agent Elkins inquired about Ms. Blevins's access to the Defendant's bedroom or asked any other questions about the matter.  Because law enforcement has the duty to resolve any ambiguity about apparent authority and because the Government bears the burden of establishing the validity of Ms. Blevins's consent, the Court finds that the absence of this evidence weighs against the Government.  However, the Court finds that the only evidence seized from that room was a box of photographs.  The ambiguity of Ms. Blevins's authority over the Defendant does not invalidate the entire search, but instead only the search of the bedroom.  Accordingly, only the box of photographs seized from the Defendant's bedroom should be suppressed.[7]

In summary, the Court finds that Ms. Blevins consented to the search of the residence on October 22, 2017.  It also finds that Ms. Blevins had authority to consent to a search of her home and that her consent was knowing and voluntary.  Finally, the Court finds that due to the absence of evidence about Ms. Blevins's mutual use of and access to the Defendant's bedroom, her

---

[7] The Court finds that the suppression of the box of photographs does not affect the validity of the October 23, 2017 search of the Jeep or the October 26, 2017 search of the residence, both of which were pursuant to search warrants.  The remedy for the improper seizure of the box of photographs is to excise that information from the search warrant affidavits and reassess whether probable cause exists in its absence.  *See Franks v.* Delaware, 438 U.S. 154, 156 (1978).  The box of photographs is not mentioned in the affidavit for the search of the Jeep [Doc. 32-1].  Although the affidavit supporting the search warrant for the search of the Defendant's home does mention that "multiple photographs of male juveniles" were among the items seized from the search of the Defendant's home, the undersigned finds the affidavit provides ample probable cause in the absence of this information.

26

authority to consent to a search of that room is unclear and, in the absence of an effort to clarify her authority on the part of law enforcement, the evidence seized from that room (a box of photographs), should be suppressed. Accordingly, the warrantless search of the Defendant's residence on October 22, 2017, should be upheld in all respects, except for the seizure of a box of photographs from the Defendant's bedroom.

### B. October 26, 2017 Search Pursuant to Search Warrant

The Defendant also asks the Court to suppress the evidence seized during the October 26, 2017 search of his residence, pursuant to a search warrant. He contends that the warrant was overly broad with respect to items to be seized. He argues that the warrant permits the seizure of any device or medium capable of storing or transmitting unlawful digital images, but the supporting affidavit only provides probable cause for the seizure of a red digital camera and a laptop computer. Accordingly, he argues that the search warrant is effectively a general warrant and the evidence seized must be suppressed.

The Fourth Amendment prohibits a judge from issuing a warrant for the search of a person, home, or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United* States, 275 U.S. 192, 196 (1927). In this way, the particularity requirement circumscribes the discretion of the executing officer. *Id.* Our appellate court has recognized that "the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." *United States v. Henson*, 848

F.2d 1374, 1383 (6th Cir. 1988), *cert. denied* 488 U.S. 1005 (1989). In this regard, a description of the items to be seized "'is valid if it is as specific as the circumstances and the nature of the activity under investigation permit.'" *Id.* (quoting *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir. 1985)). As a general rule, the warrant is sufficiently particular if it limits the executing officer to searching for evidence of a specific crime. *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018).

In the instant case, the search warrant states [Doc. 32-3] that the issuing judge finds probable cause to believe that evidence of sexual exploitation of a minor, Tenn. Code Ann. § 39-17-1003, and trafficking for commercial sex, Tenn. Code Ann. § 39-13-309, will be found at the Defendant's residence. The warrant [Doc. 32-3, pp.1-2] permits the executing officer to search for the following items: Computers and computer storage discs to retrieve evidence of the listed crimes; electronic or paper records of ownership of computers and other electronic devices; photographs that are evidence of the listed crimes; any and all electronic devices capable of analyzing, creating, displaying, or transmitting electronic data; instructions on operating computers or electronic devices; information on passwords or encryption; physical, biological, or documentary evidence of a sexual relationship between the Defendant or another adult and a minor; sexually explicit images or descriptions of children; child pornography and records of trafficking therein; child erotica; camera and video equipment; records of child abuse, child sexual abuse, pornography, child pornography or trafficking in child pornography; photographs or videos that would identify a victim; and indicia of ownership or control of the residence. The Defendant objects to the second entry, part (b), in the list of items to be seized:

> Any and all electronic devices which are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data. These devices include, but are not limited to: computer components, computer peripherals, word

processing equipment, modems, monitors, printers, plotters,
encryption circuit boards, optical scanners, external hard drives,
routers, and other computer-related electronic devices[.]

[Doc. 32-3, p.1(b)]. The Defendant asserts that while there arguably exists probable cause to seize

a red digital camera and a laptop computer, the warrant permits the seizure of any device that could

have been adapted to store unlawful digital images. In other words, he maintains that the issuing

judge lacked probable cause to permit the seizure of electronic devices beyond cameras or laptops.

"To establish probable cause, the issuing judge must 'make a practical, common-sense

decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a

fair probability that contraband or evidence of a crime will be found in a particular place.'" *United

States v. Dunning*, 857 F.3d 342, 346 (6th Cir. 2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 238

(1983)). The supporting affidavit [Doc. 32-2] of Agent Elkins relates the following, which

provides probable cause to believe that evidence of the sexual exploitation of a minor or

commercial sex trafficking would be found on electronic devices in the Defendant's residence:

(1) Detective Elkins interviewed two juvenile victims, who both
stated that the Defendant paid them to have sex with him and
that the Defendant possessed a red digital camera and a laptop
during these sexual encounters [Doc. 32-2, ¶¶1, 7]. One of the
victims said that the Defendant took photographs with a digital
camera of him and the other victim, while they were naked [Doc.
32-2, ¶7].

(2) Detective Elkins interviewed another witness, who reported that
the Defendant took photographs of him and a juvenile engaged
in sexual acts and that he has seen photographs of nude juveniles
on the Defendant's laptop computer [Doc. 32-2, ¶8].

(3) Detective Elkins listened to a recording of a telephone
conversation between the Defendant and his mother on October
22, 2017, in which the Defendant asked both is mother and his
mother's caregiver if the police had seized his laptop computer
during the search of the residence [Doc. 32-2, ¶10].

29

(4) Collectors of child pornography are likely to keep their collections in their residence in physical form and "on some or all of the magnetic storage media in the residence" [Doc. 32-2, ¶12].

(5) Agent Elkins knows that computer hardware, software, and electronic files may be contraband or evidence or may store contraband or evidence [Doc. 32-2, ¶13]. Agent Elkins asks to seize computer hardware, which he identifies as a container for evidence or contraband, and to search computers or computer hardware for and seize images and videos of "minors engaged in sexual activity" [Doc. 32-2, ¶13].

(6) Based upon his knowledge, training, and experience, Agent Elkins "knows that searching and seizing information from computers often requires the officers to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment" [Doc. 32-2, ¶14].

A judge may rely on the affiant's knowledge of the conduct of collectors of child pornography—that they keep such collections for long periods of time and that they store it in their homes—to provide probable cause for a search warrant. *United States v. Hampton*, 504 F. App'x 402, 405-06 (6th Cir. 2012). In the instant affidavit, Agent Elkins stated that collectors of child pornography typically keep their collections in their homes, stored on some or all of the magnetic storage media therein. Agent Elkins also stated that it is necessary to search computers and electronic devices offsite. "The federal courts are in agreement that a warrant authorizing the seizure of a defendant's home computer equipment *and digital media* for a subsequent off-site electronic search is not unreasonable or overbroad, as long as the probable-cause showing in the warrant application and affidavit demonstrate a 'sufficient chance of finding some needles in the computer haystack.'" *United States v. Evers*, 669 F.3d 645, 652 (6th Cir. 2012) (quoting *Upham*, 168 F.3d 532, 535 (1st Cir. 1999)) (emphasis added). Accordingly, the affidavit provided probable cause for the seizure and offsite search of the electronic devices "capable of analyzing, creating,

30

displaying, converting or transmitting electronic or magnetic computer impulses or data." The Court finds that the search warrant in this case is sufficiently particular with regard to the items to be seized.

## V. CONCLUSION

After carefully considering the parties' filings and arguments, the evidence and exhibits presented, and the relevant legal authorities, the Court finds that the Defendant's mother gave valid consent to search the residence, with the exception of the search of the Defendant's bedroom. The Court also finds that the search warrant for the search of the Defendant's residence was sufficiently particular with regard to the items to be seized. For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 29] be **GRANTED in part**, in that the box of photographs seized from the Defendant's bedroom should be suppressed, and **DENIED** in all other respects.[8]

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[8] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).